**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LUXOTTICA GROUP S.p.A., OAKLEY, INC.,
and COSTA DEL MAR, INC.,

          Plaintiffs,

v.

THE PARTNERSHIPS AND
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

          Defendants.

Case No. 24-cv-06258

**COMPLAINT**

Plaintiffs Luxottica Group S.p.A., Oakley, Inc., and Costa Del Mar, Inc. (collectively, "Plaintiffs") hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

**I. JURISDICTION AND VENUE**

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, e-commerce stores[1] operating under the seller aliases identified in

---

[1] The e-commerce store urls are listed on Schedule A hereto under the Online Marketplaces and Domain Names.

Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, have sold products using infringing and counterfeit versions of Plaintiffs' federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.     This action has been filed by Plaintiffs to combat e-commerce store operators who trade upon Plaintiffs' reputations and goodwill by offering for sale and/or selling unauthorized and unlicensed products, including eyewear, using infringing and counterfeit versions of Plaintiffs' federally registered trademarks (the "Counterfeit Products"). Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale and selling Counterfeit Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers establishing a logical relationship between them and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. Plaintiffs are forced to file this action to combat Defendants' counterfeiting of their registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiffs have been and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of

2

their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

## III. THE PARTIES

**Plaintiffs**

4.    Plaintiff Luxottica Group S.p.A. is a subsidiary of EssilorLuxottica (collectively, "Luxottica"). Plaintiffs Oakley, Inc. and Costa Del Mar, Inc. are subsidiaries of Luxottica. Plaintiff Luxottica Group S.p.A. is a corporation duly organized under the laws of Italy with its principal place of business in Milan, Italy and an office located at 4000 Luxottica Place, Mason, Ohio 45040-8114.  Plaintiff Oakley, Inc. is a corporation organized and existing under the laws of the State of Washington, having its principal place of business at One Icon, Foothill Ranch, California 92610.  Plaintiff Costa Del Mar, Inc. is a corporation duly organized under the laws of Florida with its principal place of business in Daytona Beach, Florida and an office located at 2361 Mason Avenue, Suite 100, Daytona Beach, Florida, 32117-5166.

5.    Plaintiffs are engaged in the business of producing, manufacturing and distributing throughout the world, including within this judicial district, premium, luxury and sports eyewear products under federally registered trademarks, including, but not limited to, the RAY-BAN, OAKLEY, and COSTA trademarks.

6.    For generations, Plaintiffs' brands have been the undisputed world leaders in the field of sun and prescription eyewear products, including those which prominently display the famous, internationally recognized, and federally registered RAY-BAN, OAKLEY, and COSTA trademarks (collectively, "Plaintiffs' Products").

7.    Plaintiffs' Products have become enormously popular and even iconic, driven by the brand's arduous quality standards and innovative design. Among the purchasing public, genuine Plaintiffs' Products are instantly recognizable as such. In the United States and around

the world, Plaintiffs' brands have come to symbolize high quality, and Plaintiffs' Products are among the most recognizable eyewear in the world. Plaintiffs' Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois such as Sunglass Hut, Oakley O Stores, high-end department stores, and through the official websites at ray-ban.com, oakley.com, and costadelmar.com.

8.      Plaintiffs incorporate a variety of distinctive marks in the design of the various Plaintiffs' Products. As a result of long-standing use, Plaintiffs own common law trademark rights in the Plaintiffs' Trademarks. Plaintiffs have also registered several of the trademarks with the United States Patent and Trademark Office. Plaintiffs' Products often include at least one of Plaintiffs' registered trademarks. Plaintiffs use their trademarks in connection with the marketing of Plaintiffs' Products, including the following registered marks, collectively referred to as "Plaintiffs' Trademarks."

| Registration Number | Trademark |
| --- | --- |
| 1,080,886 | RAY-BAN |
| 595,513 | WAYFARER |
| 1,537,974 | CLUBMASTER |
| 650,499 | *Ray-Ban* |
| 1,093,658 | *Ray-Ban* |
| 1,726,955 | *Ray-Ban* |

| | |
|---|---|
| 1,320,460 |  |
| 3,522,603 |  |
| 1,521,599<br>1,522,692<br>1,552,583<br>2,293,046<br>3,153,943<br>3,771,517 | OAKLEY |
| 1,980,039 |  |
| 1,356,297 |  |
| 1,519,596 |  |
| 3,151,994<br>3,496,633 |  |
| 3,331,124 |  |

| | |
|---|---|
| 1,927,106<br>1,984,501<br>2,300,245<br>3,771,516<br>5,109,790 |  |
| 4,407,750 | CROSSLINK |
| 3,733,882 | IRIDIUM |
| 4,827,569 | JAWBREAKER |
| 4,407,749 | RADARLOCK |
| 3,489,952 | OIL RIG |
| 4,194,197 | FROGSKINS |
| 3,379,110 | RADAR |
| 5,026,399 | LATCH |
| 4,822,664 | SI TOMBSTONE |
| 3,245,494 | GASCAN |
| 4,956,691 | TRIGGERMAN |
| 3,680,975 | FIVES SQUARED |
| 2,900,432 | VALVE |
| 3,941,018 | PATH |
| 5,026,407 | JUPITER SQUARED |
| 4,136,113 | BATWOLF |
| 1,701,476 | M FRAME |
| 2,054,810 | STRAIGHT JACKET |
| 3,379,109 | FLAK JACKET |
| 4,618,566 | TINCAN |
| 2,106,614 | SQUARE WIRE |
| 1,952,697 | JACKET |
| 3,468,824 | HIJINX |
| 2,087,464 | O FRAME |
| 2,087,466 | E FRAME |
| 3,126,622 | CROWBAR |
| 1,778,325 | HYBRID |
| 2,250,767 | ROMEO |
| 5,636,292 | HOLBROOK |
| 2,393,107 |  |

| | |
|---|---|
| 2,403,609 |  |
| 2,388,070 | JULIET |
| 2,155,819 | X-METAL |
| 4,813,708 | PRIZM |
| 3,857,379<br>5,653,368<br>4,163,647 | COSTA |
| 3,773,612 | COSTAS |
| 1,723,449<br>3,002,972 | COSTA DEL MAR |
| 5,729,388 | DEL MAR |
| 4,520,088<br>5,646,820<br>5,944,853 |  |
| 3,273,228<br>5,465,884<br>5,653,366 |  |
| 3,273,229 |  |
| 3,420,371 | C-MATES |
| 4,599,722 | C-WALL |
| 3,711,018 | COSTA 580 |

| | |
|---|---|
| 4,891,374 | 580 |
| 4,771,385 | BEYOND POLARIZED |
| 4,767,077 | BORN ON THE WATER |
| 3,274,581 | SEE WHAT'S OUT THERE |
| 5,446,112 | KICK PLASTIC |
| 4,768,671 | HIGHLINE |
| 3,274,582 | FATHOM |
| 2,899,507 | LIGHTWAVE |
| 3,153,673 | SILENCER |
| 3,729,798 | ZANE |
| 4,342,211 | BLACKFIN |
| 3,270,766 | HAMMERHEAD |
| 3,270,765 | HARPOON |
| 3,067,284 | HARDTOP |
| 2,312,428 | RHYNO-TUFF |
| 2,306,527 | ANTI-OCULAR INTRUSION SYSTEM |
| 3,837,688 | N |
| 3,837,682 |  |
| 3,581,846 | NATIVE |
| 5,956,148 |  |
| 5,875,336 |  |



| | |
|---|---|
| 4,114,951 | |
| 3,431,239 | |
| 3,245,770 | |

9. The above U.S. registrations for Plaintiffs' Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for Plaintiffs' Trademarks constitute *prima facie* evidence of their validity and of Plaintiffs' exclusive right to use Plaintiffs' Trademarks pursuant to 15 U.S.C. § 1057 (b). True and correct copies of the United States Registration Certificates for the above-listed Plaintiffs' Trademarks are attached hereto as **Exhibit 1**.

10. Plaintiffs' Trademarks are distinctive when applied to Plaintiffs' Products, signifying to the purchaser that the products come from Plaintiffs and are manufactured to Plaintiffs' quality standards. Whether Plaintiffs manufacture the products or contract with others

9

to do so, Plaintiffs have ensured that products bearing Plaintiffs' Trademarks are manufactured to the highest quality standards.

11.     Plaintiffs' Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1), and have been continuously used and never abandoned. The innovative marketing and product designs of Plaintiffs' Products have enabled Plaintiffs' brands to achieve widespread recognition and fame and have made Plaintiffs' Trademarks some of the most well-known marks in the sun and prescription eyewear industry. The widespread fame, outstanding reputation, and significant goodwill associated with Plaintiffs' brands have made Plaintiffs' Trademarks valuable assets of Plaintiffs.

12.     Plaintiffs have expended substantial time, money, and other resources in advertising and promoting Plaintiffs' Trademarks. In fact, Plaintiffs have expended millions of dollars annually in advertising, promoting and marketing featuring Plaintiffs' Trademarks. Plaintiffs' Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs. As a result, products bearing Plaintiffs' Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Plaintiffs. Plaintiffs' Products have become among the most popular of their kind in the U.S. and the world. Plaintiffs' Trademarks have achieved tremendous fame and recognition which has only added to the inherent distinctiveness of the marks. As such, the goodwill associated with Plaintiffs' Trademarks is of incalculable and inestimable value to Plaintiffs.

13.     Genuine Plaintiffs' Products are sold only through authorized retail channels and are recognized by the public as being exclusively associated with Plaintiffs' brands.

14. For many years, Plaintiffs have operated websites at ray-ban.com, oakley.com, and costadelmar.com. Sales of Plaintiffs' Products via these websites are significant. The websites feature proprietary content, images and designs exclusive to Plaintiffs' brands.

**The Defendants**

15. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiffs. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement systems, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

16. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

17. The success of Plaintiffs' brands has resulted in significant counterfeiting of Plaintiffs' Trademarks. In recent years, Plaintiffs have identified many fully interactive, e-commerce stores offering counterfeit Plaintiffs' Products on online marketplace platforms such as Amazon, eBay, AliExpress, Alibaba, Etsy, Wish.com, Walmart, DHgate, and Temu, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a U.S. Customs and Border

Protection (CBP) report, in 2021, CBP made over 27,000 seizures of goods with intellectual property rights (IPR) violations totaling over $3.3 billion, an increase of $2.0 billion from 2020. *Intellectual Property Rights Seizure Statistics, Fiscal Year 2021*, U.S. Customs and Border Protection (**Exhibit 2**).  Of the 27,000 in total IPR seizures, over 24,000 came through international mail and express courier services (as opposed to containers), most of which originated from China and Hong Kong.  *Id*.

18.     Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also*, report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020) attached as **Exhibit 4** and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187.

19.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, have sold Counterfeit Products to residents of Illinois.

20.     Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases look sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Plaintiffs have not licensed or authorized Defendants to use any of Plaintiffs' Trademarks, and none of the Defendants are authorized retailers of genuine Plaintiffs' Products.

21.     Many Defendants also deceive unknowing consumers by using Plaintiffs' Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products. Other e-commerce stores operating under the Seller Aliases omit using Plaintiffs' Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiffs' Products.

22.     E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete

information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

23. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

24. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other seller aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features, such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.

25. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

26. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiffs' enforcement. E-

commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiffs. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

27.     Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiffs, have jointly and severally, knowingly and willfully used and continue to use Plaintiffs' Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet.

28.     Defendants' unauthorized use of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

29.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

30.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of

15

infringing goods. Plaintiffs' Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiffs' Products offered, sold or marketed under Plaintiffs' Trademarks.

31.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiffs' Trademarks without Plaintiffs' permission.

32.     Plaintiffs are the exclusive owners of their respective Plaintiffs' Trademarks. Plaintiffs' United States Registrations for their respective Plaintiffs' Trademarks (Exhibit 1) are in full force and effect. On information and belief, Defendants have knowledge of Plaintiffs' rights in Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits of Plaintiffs' Trademarks. Defendants' willful, intentional and unauthorized use of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

33.     Defendants'   activities   constitute   willful   trademark   infringement   and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

34.     Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the goodwill of Plaintiffs' Trademarks.

35.     The injuries and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

36.    Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

37.    Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

38.    By using Plaintiffs' Trademarks in connection with the sale of Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

39.    Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

40.    Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the associated goodwill of Plaintiffs' respective brands.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using Plaintiffs' Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing,

advertising, offering for sale, or sale of any product that is not a genuine Plaintiffs' Product or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Plaintiffs' Product or any other product produced by Plaintiffs, that is not Plaintiffs' or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

d. further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill; and

e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any of Plaintiffs' trademarks, including the Plaintiffs' Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

2) Entry of an Order that, at Plaintiffs' choosing, the registrant of the Domain Names shall be changed from the current registrant to Plaintiffs, and that the domain name registries for the Domain Names, including, but not limited to, VeriSign, Inc., Registry Services, LLC, Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Domain Names to a registrar of Plaintiffs' selection, and that the domain name registrars, including, but not limited to, GoDaddy.com, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap, Inc.

("Namecheap"), shall take any steps necessary to transfer the Domain Names to a registrar account of Plaintiffs' selection; or that the same domain name registries shall disable the Domain Names and make them inactive and untransferable;

3) Entry of an Order that, upon Plaintiffs' request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Wish.com, Walmart, DHgate, Etsy, and Temu (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiffs' Trademarks;

4) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiffs be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiffs' Trademarks;

6) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 24th day of July 2024.      Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Berel Y. Lakovitsky
Thomas J. Juettner
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
blakovitsky@gbc.law
tjjuettner@gbc.law

*Counsel for Plaintiffs Luxottica Group S.p.A.,*
*Oakley, Inc., and Costa Del Mar, Inc.*